UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

DANIEL A. RAMET,

Petitioner,

v.

ROBERT LeGRANDE, *et. al,*

Respondents.

Case No. 3:14-cv-00452-MMD-WGC

ORDER

Before the Court for a decision on the merits is an application for a writ of habeas corpus filed by Daniel A. Ramet, a Nevada prisoner. (ECF No. 9.)

I. **PROCEDURAL BACKGROUND**[1]

On June 4, 2007, a jury in the state district court for Clark County, Nevada, found Ramet guilty of first degree murder. After a sentencing hearing the following day, the jury imposed a sentence of life without possibility of parole. The court entered a judgment of conviction on August 31, 2007. Ramet appealed.

On June 4, 2009, the Nevada Supreme Court affirmed the conviction in an opinion that discussed in detail only one of Ramet's claims of error, that being his claim that testimony concerning his refusal to consent to a search of his home, coupled with the prosecutor's reference to it in closing argument, violated his Fourth Amendment rights. The Nevada Supreme Court found any error in admission of that evidence harmless, and it summarily denied the remainder of Ramet's claims in a footnote.

_____

[1]This procedural background is derived from the exhibits filed under ECF Nos. 10-14 and this Court's own docket.

On December 11, 2009, Ramet filed a proper person state habeas petition, which the state district court ultimately denied without appointing counsel to represent Ramet. The Nevada Supreme Court reversed the district court, finding the state district court erred in failing to appoint counsel, and remanded to the district court for further proceedings. Appointed counsel filed a supplemental petition. The state district court held an evidentiary hearing and subsequently denied the petition. Ramet appealed. On July 22, 2014, the Nevada Supreme Court affirmed the denial of relief.

On August 28, 2014, this Court received Ramet's federal habeas petition. With the assistance of appointed counsel, Ramet filed an amended petition on May 11, 2015. On October 2, 2015, respondents filed a motion to dismiss, which the Court granted in part and denied in part – that is, the Court concluded that Claim Ten was unexhausted and that claims for relief in Claim Four that are not premised on ineffective assistance of counsel (IAC) must be dismissed as procedurally defaulted,

In addition, the Court concluded that the IAC claims in Claims Four and Six are also procedurally defaulted, but reserved judgment as to whether Ramet could demonstrate cause and prejudice to overcome the default of those claims. Thereafter, Ramet abandoned Claim Ten and the parties briefed the remaining claims on the merits.

## II.   FACTUAL BACKGROUND

The Nevada Supreme Court gave this summary of the facts of Ramet's case in its opinion deciding his direct appeal:

> Ramet killed his 20-year-old daughter, Amy Ramet, in the home they shared. Ramet strangled Amy for a minute or two and then stopped; she moved, and he checked for a pulse, and then he strangled her for "another couple of minutes." He continued to live in his home with Amy's body for three weeks, sending text messages from her cell phone to allay the fears of his younger daughter, Delsie, and his ex-wife, Bernadette.
>
> After not being able to speak with Amy for three weeks, Bernadette and Delsie became so worried that they filed a missing person's report. Three days later, unsatisfied with the police's efforts, they decided to break into Ramet's home. Bernadette broke a window with a baseball bat and a foul smell came out, prompting them to call the police. Shortly thereafter, the police arrived at Ramet's home and the officers asked to perform a welfare check on Amy. Ramet refused, claiming it was a "search and

seizure issue." The police obtained a search warrant and discovered Amy's badly decomposed body in Ramet's home. Ramet was arrested and he confessed to killing his daughter.

*Ramet v. State*, 209 P.3d 268, 269 (Nev. 2009).

## III.  STANDARDS OF REVIEW

This action is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254(d) sets forth the standard of review under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. "[A] federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773

(2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

"[A] federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004); *see also Miller-El*, 537 U.S. at 340 ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)."). Because *de novo* review is more favorable to the petitioner, federal courts can deny writs of habeas corpus under § 2254 by engaging in *de novo* review rather than applying the deferential AEDPA standard. *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

## IV.    ANALYSIS OF CLAIMS

### A.    Claim One

In Claim One, Ramet alleges that he was denied his rights under the Fourth and Fourteenth Amendment because the prosecutor improperly elicited testimony about his invocation of his Fourth Amendment rights. In addressing this issue, the Nevada Supreme Court noted as follows:

///

At trial, the State presented testimony from two officers regarding Ramet's refusal to consent to a search of his home. On the stand, Officer Yant testified that Ramet's statements that he did not want the police in his house because "it would be a search and seizure issue" made the police even more suspicious. Officer Yant repeated Ramet's statement that "it would be a search and seizure issue" two more times. Officer Bertges also repeated Ramet's statement during his testimony.

In addition, evidence of Ramet's refusal to submit to a search was used by the State to incriminate Ramet. During closing argument, the prosecuting attorney commented on Ramet's refusal: "[a]nd when the police come to the house on two different occasions, he won't even let them conduct a welfare check. He's hiding something."

*Ramet*, 209 P.3d at 269.

The Nevada Supreme Court then concluded that the admission of the evidence and the State's argument violated Ramet's constitutional rights under *Griffin v. California*, 380 U.S. 609 (1965). *Id.* at 269-70. The court also held, however, the error was harmless under *Chapman v. California*, 386 U.S. 18 (1967), due to the "overwhelming evidence of Ramet's guilt." *Id.* at 270.

In *Griffin*, the Court held that the trial court's and the prosecutor's comments on the defendant's failure to testify violated the self-incrimination clause of the Fifth Amendment. 380 U.S. at 614. While Ramet's claim alleges a violation of his rights under the Fourth Amendment, respondents do not dispute the Nevada Supreme Court's constitutional error determination. Instead, they argue that this Court must defer to the state supreme court's determination that the error was harmless under *Chapman*.

To determine whether a constitutional error is harmless under *Chapman*, a reviewing court "must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24. If a state court finds an error harmless, the federal habeas court reviews that determination under the deferential AEDPA standard, which means that relief is not available for the error "unless the state court's harmlessness determination itself was unreasonable." *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)).

And, even if the federal court determines the state court's application of *Chapman* was unreasonable, the petitioner is still not entitled to relief unless he can establish that

the constitutional error "resulted in 'actual prejudice.'" *Ayala*, 135 S.Ct. at 2197 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). Under *Brecht*, the federal court can grant relief only if it has "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). That is, "[t]here must be more than a 'reasonable possibility' that the error was harmful." *Ayala*, 135 S.Ct. at 2198 (quoting *Brecht*, 507 U.S. at 637).

In finding the Fourth Amendment violation harmless, the Nevada Supreme Court noted that "Ramet confessed during trial that he strangled his daughter, stopped and checked her pulse, and then continued to strangle her." *Ramet*, 209 P.3d at 270. Ramet argues that the state court's decision was unreasonable and that he can meet the *Brecht* standard because the error had a "deep impact" on his defense and "was particularly harmful because the evidence of first-degree murder was weak." (ECF No. 41 at 11.[2])

In this regard, he contends that evidence that he invoked his Fourth Amendment rights suggested that he was being cold and calculated, which undermined his defense that killing Amy was the result of a spur-of-the-moment impulse and that he immediately regretted it. Also damaging to that defense, however, was evidence that Ramet kept Amy's corpse in the house for several weeks and went to great lengths to conceal her death from his other daughter and ex-wife. And, given that Ramet now concedes that the evidence proved second degree murder (ECF No. 41 at 23-25), this contention has merit only if there was more than a reasonable probability that the jury relied upon the invocation of his Fourth Amendment rights to find that the murder was premeditated and deliberate. *See* NRS § 200.030. The time lag between the murder and Ramet's attempts to prevent the police from entering his home precludes such a conclusion.

Ramet also points to the extensive amount of testimony the State elicited on the subject, the fact that a juror submitted a question to Ramet about it at the conclusion of

---

[2]References to page numbers for documents filed electronically are based on CM/ECF pagination.

his testimony, and the prosecutor's references to it in closing argument, all of which, according to him, demonstrate the importance of the evidence to the State's case. This is also unavailing. The State elicited the improper testimony in its case-in-chief, prior to, and without knowing, that Ramet would subsequently provide the incriminating testimony cited by the Nevada Supreme Court in its harmless error analysis. And while the prosecutor stated in closing argument that Ramet's refusal to allow the police into his house showed that he was "hiding something," the prosecutor did not explicitly argue that it showed premeditation or deliberation. There is no dispute that the evidence was harmful to the defense, but here again, there is not a reasonable probability that it prompted the jury to find first degree murder rather than second degree murder.

In summary, Ramet fails to convincingly demonstrate that evidence and argument regarding the invocation of his Fourth Amendment rights had a significant impact on the jury's verdict. Claim One is denied.

**B.    Claim Two**

In Claim Two, Ramet alleges that he was provided ineffective assistance of counsel, in violation of his rights under the Sixth and Fourteenth Amendment, because trial counsel failed to accurately advise him of the consequences of going to trial. In support of this claim, Ramet alleges that the State offered a plea bargain that would have resulted in him serving fifteen years to life that he turned down on the advice of counsel. After trial, the jury sentenced him to life without parole.

Ineffective assistance of counsel claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must satisfy two prongs to obtain habeas relief — deficient performance by counsel and prejudice. 466 U.S. at 687. With respect to the performance prong, a petitioner must carry the burden of demonstrating that his counsel's performance was so deficient that it fell below an "objective standard of reasonableness." *Id.* at 688. "'Judicial scrutiny of counsel's performance must be highly deferential,' and 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Knowles v. Mirzayance*,

556 U.S. 111, 124 (2009) (citation omitted). In assessing prejudice, the court "must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent [counsel's] errors." *Id.* at 696.

In addressing this claim in Ramet's state post-conviction proceeding, the Nevada Supreme Court identified *Strickland* as the federal law governing the claim. (ECF No. 14-2 at 2.) The court adjudicated the claim as follows:

> [A]ppellant argues that counsel was ineffective for discouraging him from accepting the State's guilty plea offer. Appellant has failed to demonstrate deficiency. The reasonableness of counsel's actions [is] evaluated as of the time of the action, not through "the distorting effects of hindsight." *Strickland,* 466 U.S. at 689. Counsel testified that he had based his recommendation to reject the plea offer on the evidence and appellant's own words, and that it was only after hearing appellant's testimony at trial, the full contents of which he "didn't see ... coming," that he realized he should have counseled him to accept the plea offer. Further, appellant's case is distinguishable from *Lafler v. Cooper,* in which the parties stipulated that counsel was deficient where counsel's advice was based upon a misunderstanding of the legal requirements to obtain a conviction. 566 U.S. [156], 132 S. Ct. 1376, 1384 (2012). Here, the parties did not stipulate that counsel was deficient, and there is no allegation that counsel misunderstood the applicable law. Accordingly, appellant failed to demonstrate by a preponderance of the evidence that counsel's advice, at the time it was given, was objectively unreasonable. We therefore conclude that the district court did not err in denying this claim.

(*Id.* at 3.)

In *Lafler*, the allegation was that petitioner had rejected favorable plea offers "after his attorney convinced him that the prosecution would be unable to establish his intent to murder" because the victim "had been shot below the waist." *Lafler*, 566 U.S. at 161. The Supreme Court confirmed that the *Strickland* test applies to the plea bargaining process when a defendant rejects a plea offer and elects to go to trial. *Id.* at 163. The Court also rejected the notion that a fair trial "wipes clean any deficient performance by defense counsel during plea bargaining." *Id.* at 169-70. As the Nevada Supreme Court noted, however, the question whether counsel's performance fell below the *Strickland* standard was not an issue decided in *Lafler*. *Id.* at 163. Thus, other than stating that counsel's advice was concededly deficient, the Supreme Court in *Lafler* did not provide any standards under which lower courts are to evaluate the sufficiency of a trial counsel's

performance in rendering plea advice. *See id.* at 174 (stating that deficient performance had been conceded by all parties, so there is no need to address what type of performance would be required to find counsel to be constitutionally ineffective).

The Court in *Lafler* did note, however, that "an erroneous strategic prediction about the outcome of a trial is not necessarily deficient performance." *Id.* In the case below, the Sixth Circuit had "found that respondent's attorney had provided deficient performance by informing respondent of 'an incorrect legal rule.'" *Id.* at 162. The *Lafler* Court suggested that respondent's counsel may not have provided ineffective assistance if he simply thought the fact that the shots hit victim below the waist "would be a persuasive argument to make to the jury to show lack of specific intent," as opposed to believing that it precluded a "convict[ion] for assault with intent to murder as a matter of law." *Id.* at 174.

Similarly, the Ninth Circuit has held that, in the plea advice context, "[c]ounsel cannot be required to accurately predict what the jury or court might find, but he can be required to give the defendant the tools he needs to make an intelligent decision." *Turner v. Calderon*, 281 F.3d 851, 881 (9th Cir. 2002). In *Turner*, the defendant alleged ineffective assistance, in part, because counsel advised him that 15 years to life was the worst possible outcome, and that his case was not a "death penalty" case. *Id.* at 880-81. Consequently, the defendant turned down a second-degree murder plea offer and went to trial, where he was convicted of first-degree murder and robbery and subsequently sentenced to death. *Id.* at 861.

The court held that the defendant "was informed that he was subject to the death penalty, and of the plea offer," in contrast to cases where an attorney failed to advise his client of a plea offer or misled his client about the law. *Id.* at 881 "That counsel and [the defendant] chose to proceed to trial based on counsel's defense strategy and presumably sincere prediction that the jury would not award a sentence of death, does not demonstrate that Turner was not fully advised of his options." *Id.* The Ninth Circuit has also held that although "a mere inaccurate prediction, standing alone, would not constitute ineffective assistance, the gross mischaracterization of the likely outcome . . . combined

with the erroneous advice on the possible effects of going to trial, falls below the level of competence required of defense attorneys." *Womack v. Del Papa*, 497 F.3d 998, 1003 (9th Cir. 2007) (internal quotation marks omitted) (quoting *Iaea v. Sunn*, 800 F.2d 861, 865 (9th Cir. 1986)).

In this case, Ramet was charged with open murder, which included first degree murder, second degree murder, and voluntary manslaughter as possible verdicts. (ECF No. 12-3 at 5.) Other than specifically-enumerated types of murder not pertinent here, the difference between first degree murder and second degree murder, in Nevada, is that the former requires that the killing be "willful, deliberate, and premeditated." *Byford v. State,* 994 P.2d 700, 719 (Nev. 2000). Voluntary manslaughter requires "a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing." NRS § 200.050.

In a non-capital case, the possible sentences resulting from a first degree murder conviction are (1) life without the possibility of parole, (2) 20 years to life, or (3) 20 years to 50 years. NRS § 200.030(4)(b). A second degree murder conviction allows for parole eligibility after serving ten years, while a voluntary manslaughter conviction results in a sentence of one to ten years. NRS §§ 200.030(5), 200.080.

At the outset of Ramet's trial, the trial judge and the parties confirmed for the record that the State had extended a plea offer of fifteen years to life that Ramet rejected. (ECF No. 11-10 at 3.) The trial court made sure that Ramet was aware of the possible sentences he faced if convicted of first degree murder. (*Id.*)

Ramet's counsel, Norman Reed, testified at the state post-conviction evidentiary hearing that it "was a very bad idea" for him to discourage Ramet from taking the deal and that he "got it wrong." (ECF No. 13-28 at 15.) Reed elaborated on that by testifying that he "looked at the evidence and thought that . . . we really had a good shot at a manslaughter," but "in retrospect . . . evaluating the evidence and hearing [Ramet's] testimony . . ., it was very ill-advised to have told him to turn down such a good offer." (*Id.*

at 16.) Regarding the chances of a manslaughter verdict, Reed testified that their defense strategy was that Ramet had killed his daughter in a heat of passion, without premeditation or deliberation. (*Id.* at 18.) As for Ramet's trial testimony, counsel testified that "it played out" in a way he "completely didn't see . . . coming" and that if he had had a "better handle" on that, he "would've told [Ramet] to take the deal." (*Id.*)

Ramet testified at the post-conviction evidentiary hearing that, prior to trial, Reed "was mocking the [State's] offer saying that they were adding five years for an enhancement on some charge that was going to be made up." (*Id.* at 34.) He further testified that he (Ramet) was aware that the punishment for second degree murder was ten to 25 years or ten to life and that he probably would have taken a deal with a minimum sentence of 10 years, but that the State never offered less than 15 years. (*Id.* at 34-37.) He also testified, however, that he would have first conferred with "Mr. Reed, who I had a lot of confidence in and trust in." (*Id.* at 36.)

Given Ramet's confession to the police and statements Ramet made to his daughter in recorded phone calls, Reed's assessment of Ramet's chances at trial was clearly misguided. For one, he underestimated the possibility that the State would be able to prove first degree murder. Most notable was Ramet's admission to his daughter that he had stopped strangling Amy when she passed out, but resumed when she "came to a little bit." (ECF Nos.10-12 at 4 and 10-14 at 4.) The State relied on this point to argue that the murder was premeditated and deliberate. (ECF No. 12-2 at 6.)

Secondly, Reed overestimated the likelihood of a manslaughter verdict. The defense's case relied on evidence that Ramet was deeply depressed and suicidal at the time of the killing. (ECF No. 12 at 29-36.) His wife had divorced him after meeting another man online. (*Id.*) He had lost his long-time job as a bartender at a casino and was out of money. (*Id.*) His house was in foreclosure and lacked power and running water. (*Id.*) He had no money for food, and had to live off of dog and cat food. (*Id.*) Amy, who had recently moved back into Ramet's house, was unhappy about the living conditions. (*Id.* at 37.) On the day of the killing, Amy was upset because there was no food. (*Id.*) After unsuccessfully

calling friends to bring her food, she came out of the bedroom, threw a glass object at Ramet, and then began berating him — telling him that he was a loser and that he should just kill himself. (*Id.*) Ramet "snapped" and "strangled her." (*Id.*)

Based on these circumstances, Reed had at least some reason to believe the State would not be able to prove premeditation and deliberation, but he was unjustifiably-optimistic in predicting a "good shot at manslaughter." As hurtful as Amy's insults may have been, they were hardly "a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person." *See* NRS § 200.050. And, because the definition incorporates a "reasonable person" standard, evidence that Ramet was emotionally distraught, with his personal life was in shambles, was not necessarily relevant.

Notwithstanding the foregoing, this Court is not convinced that Reed's performance fell below the *Strickland* standard as applied in the plea bargaining context. There is no evidence that his advice to Ramet included an "incorrect legal rule," as contemplated in *Lafler*. And, while Reed inaccurately predicted the outcome of Ramet's trial, the record does not demonstrate "gross error on the part of counsel" — i.e., the type of error necessary to conclude that Reed was unconstitutionally deficient in advising Ramet to turn down the plea offer. *Turner*, 281 F.3d at 881 (citation omitted).

Ramet was informed by counsel and the trial court that a first degree murder conviction was a possible outcome and that such a conviction could result in a life sentence without possibility of parole. In addition, Reed was not unreasonable in believing, prior to trial, that the State would not be able to satisfy the elements of first degree murder.[3] It was Ramet's testimony at trial that provided the strongest evidence of premeditation and deliberation, including his admission that he "look[ed] for a pulse"

///

///

---

[3]Indeed, Ramet argues at length in his reply brief, in support of Claim One, that the State's case for first-degree murder was weak. (ECF No. 41 at 16-25.)

before strangling Amy for "another couple of minutes."[4] (ECF No. 12 at 43-44.) Accordingly, it was also not unreasonable for Reed to predict that the worst likely outcome resulting from going to trial would be a second degree murder conviction with a ten to life sentence — i.e., five years less than the State's plea offer.

In sum, Reed's advice to Ramet with respect to the State's offer was not outside the "wide range" of reasonable professional assistance. *Strickland*, 466 U.S. at 687. Moreover, as the Supreme Court has stated, "[w]hen a state prisoner asks a federal court to set aside a sentence due to ineffective assistance of counsel during plea bargaining, our cases require that the federal court use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S.Ct. 10, 13 (2013). Because the Nevada Supreme Court's decision denying relief is reasonable and supported by the record, Ramet is not entitled to federal habeas relief on Claim Two.

## C. Claim Three

In Claim Three, Ramet alleges that he did not knowingly or voluntarily waive his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and the admission of his involuntary confession violated his Fifth and Fourteenth Amendment rights. In support of this claim, he contends that, before his confession to law enforcement, he had stayed up all night surrounded by police and that, during the interrogation, the police applied psychological pressure, discouraged him from getting an attorney, gave him legal advice instead of providing him an attorney, and refused to allow him to contact his daughter until he confessed. According to Ramet, his will was overborne, so he confessed.

---

[4]Ramet made several admissions in his trial testimony that were significantly more damaging than his statements to the police and to his daughter. For example, when asked on cross-examination what he did when Amy moved a little bit after he choked her initially, Ramet replied:

> As I said, I tried to make a decision, check her, see what was going on or not, and I figure at this time that she might be near dead, you know, so I'm looking for a pulse . . ..

(ECF No. 12 at 44.) This was presumably an example of testimony that Reed "didn't see coming."

As mentioned, the Nevada Supreme Court rejected several of Ramet's claims in a footnote to its opinion on direct appeal.[5] *Ramet*, 209 P.3d at 268 n.1. This claim was among them. *See id.*

"[T]he determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel." *Fare v. Michael C.*, 442 U.S. 707, 724–25 (1979) (citing *Miranda*, 384 U.S. at 475-477). The U.S. Supreme Court has held that "[t]he voluntariness of a waiver of [the privilege against self-incrimination] has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986). "[C]oercive police activity is a necessary predicate to the finding that a confession is not voluntary . . .." *Connelly*, 479 U.S. at 167 (internal quotation marks omitted). And, while the mental condition of the defendant may be a significant factor in the "'voluntariness' calculus," that does not mean that "a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" *Id.* at 164.

The state court record does not support Ramet's claims of police coercion. Ramet claims that before his arrest the police had him "under siege" in his house for ten hours. (ECF No. 9 at 21.) What the record shows, however, is the following. Police were called regarding a domestic disturbance at Ramet's home and, upon arriving around 8:00 p.m., found Ramet's ex-wife, holding a baseball bat, and his daughter in front of the house. (ECF No. 11-11 at 13, 19.) The police also noted "a very foul odor" coming from a broken window that smelled of "a decomposing human body." (*Id.* at 14, 20.) After officers

---

[5]The Nevada Supreme Court summarily denied five of Ramet's direct appeal arguments in the footnote. Even though the court did not explain its reasons for rejecting these arguments, this Court must presume that the court adjudicated Ramet's federal law claims on the merits for the purposes of 28 U.S.C. § 2254(d). *See Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

knocked on the front door for several minutes, Ramet answered the door, but denied the officers entry into the house. (*Id.* at 13-16, 20-22.) The officers then posted themselves on each side of the house "just to make sure Daniel didn't try to leave." (*Id.* at 23.) Later in the evening, detectives set up a command post at a junior high school across the street. (*Id.*) Once the detectives obtained a search warrant, the SWAT team arrived about 4:15 a.m., pulled an armored vehicle up onto Ramet's front lawn, and used a bullhorn to tell Ramet to exit his house. (*Id.* at 16-17.) Ten to fifteen minutes later, Ramet came out of the house and was arrested without incident. (*Id.*)

With respect to the interrogation, the transcript and videotape of the event show that police detectives clearly advised Ramet of his *Miranda* rights prior to questioning him and repeatedly acknowledged throughout the interview that he had the right to remain silent and the right to state-provided counsel. (ECF Nos. 10-8/15). Police provided Ramet with food, something to drink, and a restroom break. (*Id.*) The videotape also supports a finding that the detectives were non-confrontational and did not, at any point, apply undue pressure to obtain a confession. (ECF No. 15.) In addition, the transcript does not support Ramet's claim that the detectives would not allow him to call his daughter until he confessed. They advised him that they would allow him to speak with her, to the extent she was willing, at the conclusion of the interview, but they did not condition that opportunity on him confessing to the murder. (ECF No. 10-8 at 32-33, 54-55.) In addition, Ramet's vague references to an attorney or wanting to talk to someone about his "psychological situation" were not sufficient to invoke his right to counsel. (*Id.* at 9-11, 18-19.) *See Davis v. United States*, 512 U.S. 452, 459 (1994) (holding that a "suspect must unambiguously request counsel" to require that officers stop questioning).

Here, the totality of the circumstances surrounding the interrogation show Ramet's waiver of his *Miranda* rights was voluntary, knowing and intelligent. In addition, he has not shown that his confession was the product of police coercion. The Nevada Supreme Court's denial of Ground Three was based on a reasonable determination of the facts and

///

was neither contrary to, nor an unreasonable application of, clearly established federal law, within the meaning of 28 U.S.C. § 2254(d).

Claim Three is denied.

**D.    Claim Four**

In Claim Four, Ramet alleges that police failed to honor his invocation of his right to remain silent, in violation of his Fifth, Sixth, and Fourteenth Amendment rights, and that trial and direct appeal counsel were ineffective for failing to raise this claim, in violation of his Sixth and Fourteenth Amendment rights. According to Ramet, he invoked his right to remain silent when the police arrived at his home and, therefore, any subsequent statements made to the police should have been suppressed. He also claims that the police coached his daughter to question him about Amy's death, so his statements to her in their phone conversations should have also been suppressed.

In deciding respondents' motion to dismiss, this Court determined that this claim is procedurally defaulted, but gave Ramet the opportunity to demonstrate that the default of the IAC claims should be excused under *Martinez v. Ryan*, 566 U.S. 1 (2012). (ECF No. 34 at 4-6.) The Supreme Court recently confirmed that *Martinez* is confined to defaulted claims of ineffective assistance of trial counsel and declined to extend the holding to defaulted claims of ineffective assistance of appellate counsel. *See Davila v. David*, 137 S. Ct. 2058, 2070 (2017). Thus, only the default of Ramet's ineffective assistance of trial counsel claims may be excused under *Martinez*.

In *Martinez*, the Supreme Court held that, in collateral proceedings that provide the first occasion to raise a claim of ineffective assistance at trial, ineffective assistance of post-conviction counsel in that proceeding may establish cause for a prisoner's procedural default of such a claim. *Martinez*, 566 U.S. at 9. Ramet must show not only post-conviction counsel's ineffectiveness but also "that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14. Because these determinations are intertwined with the ultimate merit of Claim Four, the Court

deferred ruling on the cause and prejudice issue until the merits of the claim were briefed. (ECF No. 34 at 6.)

As discussed above in relation to Claim Three, Ramet did not invoke his Fifth Amendment rights after being given the *Miranda* warning prior to police questioning. He contends in Claim Four, that the police were nonetheless not permitted to question him because he had invoked his right to remain silent when the police first contacted him at his home. Ramet is incorrect.

An invocation of the right to remain silent, like the right to counsel, must be unambiguous. *Berghuis*, 560 U.S. at 381-82. This requirement applies regardless of whether the statements allegedly invoking the privilege occur before or after the suspect receives a *Miranda* warning. *Sessoms v. Grounds*, 776 F.3d 615, 621 (9th Cir. 2015). Here, Ramet claims he invoked his right to remain silent when police came to his house on the domestic disturbance call, but cites to no evidence to support this claim other than police reports of that incident. (ECF No. 9 at 29.) Those reports indicate that, after the police knocked on his door for several minutes, Ramet opened the door and spoke with police, answering several questions. (ECF Nos. 10-4, 10-5, and 10-7.) While the reports show that he refused to allow the police in his house and kept telling them to leave, there is no indication that he expressly invoked his right to remain silent. *See Salinas v. Texas*, 133 S. Ct. 2174, 2179-82 (2013) (discussing "the express invocation requirement" and confirming that "[a] suspect who stands mute has not done enough to put police on notice that he is relying on his Fifth Amendment privilege.").

Even assuming Ramet's interaction with the police at his home could be construed as an invocation of his right to remain silent, his post-*Miranda* statements to the police and to his daughter were nonetheless admissible. Ramet relies on *Mosley v. Michigan*, 423 U.S. 96, 97 (1975), to claim that the police were required to honor his right to cut off questioning. (ECF No. 9 at 29.) In *Mosley*, however, "the Supreme Court rejected the proposition that its earlier decision in *Miranda* barred law enforcement officials from ever questioning a suspect after the suspect had invoked his right to remain silent," advocating

instead "a case-by-case approach that takes the concerns of the *Miranda* Court into account." *United States v. Hsu*, 852 F.2d 407, 409 (9th Cir. 1988).

Relying on *Mosley*, the court in *Hsu* held that the defendant's right to cut off questioning was scrupulously honored where the defendant asserted his right to remain silent during an initial interrogation, then answered questions during a second interrogation after being advised again of his *Miranda* rights. *Id.* at 412. The court focused on "the provision of a fresh set of *Miranda* rights" as "the most important factor" in arriving at that conclusion. *Id.* at 411. The court also noted "the change of scenery" between the two interrogations as another important factor. *Id.* at 412. Both of those circumstances were present in Ramet's case.

Because Ramet voluntarily waived his right to remain silent after being given the *Miranda* warning, his confession to the police and his statements to his daughter in subsequent phone calls were admissible at trial. The claim that counsel was ineffective in failing to argue that Ramet had invoked his right to remain silent, as grounds for suppressing either, is without merit for the purposes of *Martinez*.[6] Thus, Claim Four is dismissed as procedurally defaulted.

### E.    Claim Five

In Claim Five, Ramet contends that the State failed to prove the victim's death was the result of criminal agency, in violation of his rights under the Fourth and Fourteenth Amendment. In support of this claim, Ramet argues that the only evidence establishing that he was responsible for Amy's death, were his own admissions, which in the absence of sufficient independent evidence, is not sufficient to establish *corpus delicti* under Nevada law. *See Sheriff, Washoe Cty. v. Middleton*, 921 P.2d 282, 286 (Nev. 1996). Ramet contends that there was insufficient evidence at both the preliminary hearing and the trial to establish *corpus delicti*.

---

[6]To be clear, trial counsel did file motions to suppress with respect to Ramet's confession to the police and his phone calls to his daughter, both of which were denied. (ECF Nos. 10-35, 10-36, and 10-(41-44).) Ramet's claim is that counsel was ineffective in failing to argue, in support of those motions, that Ramet had invoked his right to remain silent.

Under Nevada law, the *corpus delicti* of murder requires proof of two elements: (1) the fact of death; and (2) the criminal agency of another responsible for that death. *Hooker v. Sheriff, Clark Cty.*, 506 P.2d 1262, 1263 (Nev. 1973). In addition, "[t]he *corpus delicti* of a crime must be proven independently of the defendant's extrajudicial admissions." *See Doyle v. State*, 921 P.2d 901, 910 (Nev. 1996), *overruled on other grounds by Kaczmarek v. State*, 91 P.3d 16, 29 (Nev. 2004). At a minimum, this requires a prima facie showing by the State "'permitting the reasonable inference that a crime was committed.'" *Id.* (citation omitted). The identity of the perpetrator is not an element of *corpus delicti. State v. Fouquette*, 221 P.2d 404, 418 (Nev.1950)

In deciding respondents' motion to dismiss, this Court concluded that Claim Five presents a federal issue under *Jackson v. Virginia*, 443 U.S. 307 (1979). (ECF No. 34 at 8.) Under *Jackson*, the reviewing court asks "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (citation omitted). Under AEDPA, "there is a double dose of deference that can rarely be surmounted." *Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011); *see Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam) (describing habeas review of sufficiency claims as applying a "twice-deferential standard"); *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam) (explaining that sufficiency claims "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference"). "[T]o grant relief, [the Court] must conclude that the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable." *Boyer*, 659 F.3d at 965.

Here, respondents argue that the *corpus delicti* rule is not grounded in the U.S. Constitution and, instead, is a creature of state law, the application of which is not reviewable in federal habeas corpus proceedings. With respect to Ramet's claim in relation to the preliminary hearing, this Court agrees that his challenge to the sufficiency

of the evidence does not provide grounds for habeas relief. Indeed, Ramet would not be entitled to habeas relief even if the State deprived him of a preliminary hearing altogether. *See Gerstein v. Pugh*, 420 U.S. 103, 119 (1975) ("[A] conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause"); *United States v. Studley*, 783 F.2d 934, 937 (9th Cir.1986) (conviction affirmed despite violation of statutory probable cause requirement).

As for the sufficiency of evidence at trial, Ramet cannot establish the that the Nevada Supreme Court's denial of his claim was objectively unreasonable.[7] For one, the *corpus delicti* rule he relies upon applies to *extrajudicial* confessions. *See Doyle*, 921 P.2d at 910; *see also United States v. Kerley*, 838 F.2d 932, 939-40 (7th Cir.1988) (observing that the *corpus delicti* rule is a "vestige of a time when brutal methods were commonly used to extract confessions, sometimes to crimes that had not been committed"). Here, Ramet testified at trial that he strangled his daughter. (ECF No. 12 at 37-38.) Thus, the State did not need to rely upon his extrajudicial admissions to establish criminal agency.

Also, in conducting its *Jackson* analysis, "'a reviewing court must consider all of the evidence admitted by the trial court,' regardless whether that evidence was admitted erroneously." *McDaniel v. Brown*, 558 U.S. 120, 131 (2010) (quoting *Lockhart v. Nelson*, 488 U.S. 33, 41 (1988). Thus, even if the state trial court violated the *corpus delicti* rule in admitting Ramet's confession, the confession must nonetheless be factored into this Court's *Jackson* analysis. Because overwhelming evidence presented at trial establishes that Amy's death was the result of a criminal act, Claim Five fails.

## F.    Claim Six

In Claim Six, Ramet alleges that trial counsel was ineffective, in violation of his Sixth and Fourteenth Amendment rights, for failing to request an instruction that the State was required to prove *corpus delicti* beyond a reasonable doubt. Ramet contends that he was prejudiced because "the jury was never instructed that it had to find, beyond a

---

[7]The Nevada Supreme Court summarily rejected the claim in the aforementioned footnote. *Ramet*, 209 P.3d at 268 n.1.

reasonable doubt and independent of Mr. Ramet's confession, that Ms. Ramet's death was caused by criminal agency." (ECF No. 9 at 41-42.) Like Claim Four, this claim is procedurally defaulted. (ECF No. 34 at 7.) Thus, as described in relation to Claim Four, Ramet must show the claim has "some merit" in order for this Court to reach the merits.

He cannot make such a showing because Nevada law does not require the State to prove *corpus delicti* both beyond a reasonable doubt *and* independent of the defendant's confession. The Nevada Supreme Court has explained that, under the *corpus delicti* rule, "the nature and degree of independent proof required to corroborate a defendant's admission" is "'not . . . beyond a reasonable doubt,'" but rather, "'[a] slight or prima facie showing, permitting the reasonable inference that a crime was committed.'" *Doyle*, 921 P.2d at 910 (quoting *People v. Alcala*, 685 P.2d 1126, 1136 (Cal. 1984)).

Ramet's trial counsel did not perform below the *Strickland* standard, nor can Ramet show prejudice, by virtue of counsel's failure to request a jury instruction not countenanced by Nevada law. Thus, Claim Six is without merit for the purposes of *Martinez* and is, therefore, dismissed as procedurally defaulted.

### G. Claim Seven

In Claim Seven, Ramet alleges that trial counsel was ineffective, in violation of his Sixth and Fourteenth Amendment rights, for failing to adequately investigate his mental health and failing to adequately present this issue to the jury. According to Ramet, a mental health expert "would have been able to explain how [his] severe depression affected his mental state" and "would have been able to put [his] actions in context for the jury in a way that no lay witness could." (ECF No. 9 at 42.) He further alleges that "[a]n expert also may have shown that additional defenses were available to Mr. Ramet based on his mental state." (*Id.*)

The Nevada Supreme Court addressed this claim in affirming the lower court's denial of this claim in Ramet's state post-conviction proceeding. (ECF No. 14-2.) Having identified *Strickland* as the federal law standard, the state supreme court held as follows: ///

[A]ppellant argues that counsel was ineffective for failing to adequately investigate his mental health through a psychological or psychiatric evaluation. Appellant has failed to demonstrate prejudice. Appellant failed to produce an expert witness or report at his evidentiary hearing to indicate what the results of an evaluation would have been. Accordingly, appellant failed to demonstrate a reasonable probability of a different outcome had counsel obtained a psychological or psychiatric evaluation. We therefore conclude that the district court did not err in denying this claim.

(ECF No. 14-2 at 3-4.)

The Nevada Supreme Court's adjudication of the claim is entitled to deference under § 2254(d). "[T]he presentation of expert testimony is not necessarily an essential ingredient of a reasonably competent defense." *Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995). More importantly, Ramet has presented no evidence setting forth the testimony an expert witness would have provided or demonstrating that it actually would have supported his defense. *See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (no ineffective assistance of counsel for failing to retain expert where petitioner did not offer evidence that expert would have provided). In addition, mere conjecture as to the availability of a favorable expert opinion is not sufficient to show prejudice. *See Grisbv v. Blodgett*, 130 F.3d 365, 373 (9th Cir.1997) ("Speculation about what an expert could have said is not enough to establish prejudice.").

Claim Seven is denied.

**H.    Claim Eight**

In Claim Eight, Ramet claims he was denied his right to due process by the improper admission of evidence that he took Amy, then 17 years-old, and her best friend out drinking. During the direct examination of the friend, the prosecutor asked: "Did you ever go anywhere with the defendant as you got into high school?" (ECF No. 11-12 at 27.) She responded: "Yes, he would take us, me and Amy, downtown to watch the bands and drink." (*Id.*) After a bench conference, the trial court struck the comment (*id.* at 28), but Ramet claims that it was nonetheless unduly prejudicial because the jury had learned that he not only had killed his daughter, but that he also had encouraged her to drink

///

alcohol when she was a minor. He further alleges that the trial court's instruction to strike the statement was insufficient to cure the harm caused by this testimony.

This claim is one of the claims the Nevada Supreme Court rejected in the footnote to its opinion on direct appeal. *Ramet*, 209 P.3d at 268 n.1.

A state trial court's admission of evidence under state evidentiary law will form the basis for federal habeas relief only where the evidentiary ruling "so fatally infected the proceedings as to render them fundamentally unfair" in violation of the petitioner's due process rights. *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991); *see also Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) ("The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process.") (citation omitted).

The U.S. Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990). The Court has declined to hold that evidence of other crimes or bad acts "so infused the trial with unfairness as to deny due process of law." *Estelle v. McGuire*, 502 U.S. 62, 75 & n.5. (1991); s*ee also Spencer v. Texas*, 385 U.S. 554, 564-64 (1967) (rejecting argument that due process requires the exclusion of prejudicial evidence). In sum, "[t]he Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process." *Holley*, 568 F.3d at 1101. The Ninth Circuit in *Holley* noted that the Supreme Court **"**has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ" and that "[a]bsent such 'clearly established Federal law,' we cannot conclude that the state court's ruling was an 'unreasonable application.'" *Id.* (citing *Carey v. Musladin*, 549 U.S. 70, 77(2006)

Based on *Holley*, Ramet's claim is foreclosed by the absence of clearly established Federal law "ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley,* 568 at 1101**.** This Court cannot conclude that the state court's ruling on this issue was either contrary

to, or an "unreasonable application" of, clearly established Federal law. And, even without the deference required under AEDPA, the claim fails because there is no possibility that the evidence had "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

Claim Eight is denied.

## I.     Claim Nine

In Claim Nine, Ramet contends he was denied his right to due process by the prosecutor's improper remarks suggesting that he had committed other serious offenses. Ramet cites to the prosecutor's comment during closing argument wherein the prosecutor provided examples of Ramet "minimizing" his past conduct and then stated, "And then with the most serious offense of his life he again —." (ECF No. 12-2 at 8.) At that point, trial counsel objected to the prosecutor's mischaracterization, pointing out, "[t]here's no other evidence of any other offense in his life." (*Id.*) Ramet claims that the trial court exacerbated the effect of the comment by stating: "Objection is noted but overruled. I think that killing is pretty serious. I think it's a fair comment." (*Id.*)

This claim is also one of the claims the Nevada Supreme Court rejected in a footnote to its opinion on direct appeal. *Ramet*, 209 P.3d at 268 n.1.

"Improper argument does not, per se, violate a defendant's constitutional rights." *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993) (citations omitted). Habeas corpus relief is available on grounds of improper argument only when the "prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 171 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Relief will be granted when the prosecutorial misconduct amounts to constitutional error, and such error is not harmless under *Brecht*. *Thompson v. Borg*, 74 F.3d 1571, 1577 (9th Cir. 1996) ("Only if the argument were constitutional error would we have to decide whether the constitutional error was harmless.")

///

This Court is not convinced that the comment was sufficient to cause the type of harm that would provide grounds for habeas relief. Placed in context, the comment was referring to "offenses" in a broader sense, not criminal offenses. Even though the trial court's ruling appears to have missed the point of the objection, the comment was so fleeting as to have no appreciable prejudicial impact. Thus, it did not render the trial so unfair that it violated Ramet's right to due process. The Nevada Supreme Court's rejection of the claim was not unreasonable.

Claim Nine is denied.

## V.   CONCLUSION

For the reasons set forth above, Ramet's petition for habeas relief is denied.

*Certificate of Appealability*

This is a final order adverse to the petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability (COA). Accordingly, the Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

Having reviewed its determinations and rulings in adjudicating Ramet's petition, the Court finds that the *Slack* standard is met with respect to one claim on the merits. Reasonable jurists could debate the Court's decision to deny Claim Two, above. The Court therefore will grant a certificate of appealability as to that issue. The Court declines

to issue a certificate of appealability for its resolution of any procedural issues or any of Ramet's remaining habeas claims.

It is therefore ordered that Ramet's amended petition for writ of habeas corpus (ECF No. 9) is denied. The Clerk will enter judgment accordingly.

It is further ordered that a certificate of appealablity is granted as to the following issue:

> Whether Claim Two, alleging a violation of the Sixth and Fourteenth Amendment due to trial counsel's inaccurate advice about the consequences of going to trial, fails on the merits.

A certificate of appealability is otherwise denied.

DATED THIS 24th day of January 2018.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE